UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

JOHN WYMAN,                           )
                                      )
            Plaintiff,                )
                                      )
      v.                              )        No. 1:10-cv-465-NT
                                      )
MAINEGENERAL MEDICAL CENTER,          )
                                      )
            Defendant                 )

## RECOMMENDED DECISION

In this removed action, Plaintiff John Wyman contends that Defendant MaineGeneral

Medical Center engaged in age and disability discrimination when it failed to retain him as an

employee following a reorganization of its information technology operations, in violation of the

Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Maine

Human Rights Act.  MaineGeneral has filed a motion for summary judgment (Doc. No. 16),

which the Court referred for report and recommendation.  I recommend that the Court deny the

motion in part and grant the motion in part.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  By local rule, summary judgment facts are introduced by means of "a separate,

short, and concise statement of material facts," which statements must be supported by record

citations.  D. Me. Loc. R. 56(b), (c).  The Court's review of the record is guided by the moving

party's statement, the non-moving party's opposing statement, including any additional

statement, and the moving party's limited reply statement.  D. Me. Loc. R. 56(b), (c), (d).

Appropriate record sources include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

Wyman is entitled to have the summary judgment facts considered in the light most favorable to his cause. Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011). If the Court's review of the record reveals evidence sufficient to support a judgment in favor of Wyman on one or more of the claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## STATEMENT OF FACTS

The parties' statements of material facts consist of Defendant's Statement of Material Facts (Def.'s Stmt., Doc. No. 17), Plaintiff's Response Statement (Pl.'s Response, Doc. No. 27), Plaintiff's Additional Statement (Add'l Stmt., Doc. No. 41), and the Defendant's Reply Statement (Reply Stmt., Doc. No. 46). The following recitation begins with a description of what is offered in Defendant's Statement and Plaintiff's Response. Thereafter, Plaintiff's Additional Statement and Defendant's Reply are considered.

## A.    Defendant's Statement and Plaintiff's Response

MaineGeneral operates three medical center campuses in Augusta and Waterville, Maine. MaineGeneral employed Wyman in its Information Technology (IT) Division for twenty years, from July 26, 1988, through August 12, 2008. (Def.'s Stmt. ¶¶ 1-2.) John Wyman was diagnosed with bladder cancer in 1981. Between 1981 and 2010, Wyman had ten or more

surgeries to remove tumors from his bladder. Wyman also had colon surgery in 1995. In 2005, Wyman had cancer in his ureter that required a partial removal of his ureter and reconstruction of his bladder. In 2007, Wyman had a cancerous kidney removed. For these procedures, Wyman missed from a few days to six weeks of work at MaineGeneral. For each of the times Wyman had to be out of work for a reason related to his health, he always received the time off he needed. Each time Wyman required a medical leave, he received all the benefits to which he understood he was entitled. Each time Wyman returned to work from a medical leave, he required a transitional, light-duty schedule before he could resume full-time work. Each time Wyman returned to work from a medical leave, he was always able to get whatever light-duty schedule his doctor recommended for him. (Id. ¶¶ 123-132.)

Initially, Wyman's position was classified as Computer Operator, but by 2005 his position came to be called Client Support Technician. (Id. ¶¶ 3-4.) The primary duties of this position were to perform data processing and maintenance tasks associated with the operation of mainframe computers on the day shift in the Data Center in Augusta, with a secondary responsibility to answer calls to the help desk. (Id. ¶ 5.) Wyman's direct supervisor, between 2000 and 2007, was Valerie Leathers. (Id. ¶ 6.) As of his final performance evaluation in August 2007, Wyman's enumerated job duties were as follows:

a. Operate and monitor the computer system and auxiliary equipment using the operating system utilities and commands;

b. Follow established procedures and standards for system operation, backup and integrity, report production and distribution and tape management;

c. Under the direction of programming staff, modify code language;

d. Assist in documenting operational procedures;

e. Cover the Service Desk – assisting users, logging the calls into our Data Base, resolving calls in a timely manner;

f. Perform other related duties as assigned or requested.

(Id. ¶ 7.)

Before April 2003, MaineGeneral staffed its help desk function with Data Center "operators," later named Client Support Technicians (CSTs) and Desktop Support Technicians. (Id. ¶ 8.)  In April 2003, MaineGeneral engaged outside contractors to cover its help desk during week days, with off-hours support coming from Data Center CSTs, and renamed its help desk the Service Desk.  (Id. ¶ 9.)  In 2005, MaineGeneral made the day-time contractors its employees and designated them Service Desk Technicians (SDTs).  (Id. ¶ 10.)

In spring 2007, in anticipation of a need for additional Service Desk staff due to planned application rollouts that year, MaineGeneral moved Service Desk operations to a larger office space at First Park, an office park in Oakland.  (Id. ¶ 11.)  The changes to the Service Desk were needed because MaineGeneral had provided many personal computers to employees throughout the organization and had migrated a significant number of functions from its mainframe computers to Microsoft Windows-based applications, creating the need for a more proficient Service Desk staff dedicated to providing fast responses to end user questions.  (Id. ¶ 12.)  As of 2007, the Service Desk was primarily staffed by two day-time SDTs located at First Park, who had as their primary function to take help desk calls from end users, record their problems in a database and create a "ticket" for each call, and either resolve the problems or forward them to another level of support at MaineGeneral.  (Id. ¶ 13.)  The primary function of the CST staff, meanwhile, was to operate MaineGeneral's mainframe-based systems, to answer Service Desk calls that the SDTs could not cover, and to provide Service Desk support during the evening and night shifts when call volume was much lower.  (Id. ¶ 14.)  As a CST, Wyman performed those duties.  He also would respond to Service Desk support tickets during the days

that called for desk top support, according to a narrative evaluation for the year between July 2006 and July 2007. (Pl.'s Response ¶ 14.) The evaluation states that Wyman gained more experience with devices and software, learned better hands on, and was enthusiastic about learning more. (Id.; Gallup Aff. Ex. C at p.3 ¶ 5, Doc. No. 18-3.) This notation appears to describe professional development subsequent to 2005.

MaineGeneral flags the fact that, in November of 2005 and 2006, and in August of 2007, Valerie Leathers noted on Wyman's performance reviews that Wyman needed to continue his development and become more efficient on the Service Desk. (Def.'s Stmt. ¶¶ 15-17.) However, Leathers, who completed these evaluations, has supplied an affidavit in which she attests to the fact that she always rated Wyman satisfactory, without ever an unsatisfactory rating between 2001 and 2007. She additionally explains:

> In 2005 to 2007 I put on John's evaluation that he needed improvement on the Service desk regarding [his] performance, but everyone needs improvement. Again John never received an unsatisfactory. At no point did I consider such an assessment could or would put his job or anyone else's job in jeopardy.

(Pl.'s Response ¶ 15; Leathers Aff. ¶ 13, Doc. No. 34.)

In October 2007, Valerie Leathers separated from MaineGeneral for a period of time. (Def.'s Stmt. ¶ 21.) Mark St. John, Director of Client Services, had supervisory responsibility for the Data Center and other IT divisions at that time. St. John reported to MaineGeneral's Chief Information Officer, one Kash Bassavappa until late 2007, and thereafter Dan Burgess. (Id. ¶¶ 19, 20.) Because a restructure of IT operations was on the horizon, St. John did not replace Leathers and instead reassigned supervisory oversight for the Data Center to Gale LaPlante, who was already supervising the Service Desk. This made Gale LaPlante Wyman's new direct supervisor. (Id. ¶¶ 19, 22.)

The migration of computing to Microsoft Windows-based applications made the support work of the Service Desk significantly more complex and challenging between 2005 and 2008. (Id. ¶ 23.) The changes included a move to new software systems in 2007, such as Sunrise Clinical Manager, a primary clinical information system, and PeopleSoft, a procurement application, which resulted in increased call volume to the Service Desk. (Id. ¶ 24.) The move to the Sunrise Clinical Manager system shifted a significant volume of work away from the Data Center and to the Service Desk, although there is a conflict in the evidence about whether the former clinical information system, which was called Prism and was overseen by the Data Center CSTs, was discontinued altogether or continued in a limited capacity. (Id. ¶ 26; Pl.'s Response ¶ 26.) Additionally, automation of certain Data Center processes on certain mainframe computers further diminished the duties of the Data Center CSTs, though some duties remained in this regard. (Def.'s Stmt. ¶ 27; Pl.'s Response ¶ 27.)

The parties agree that MaineGeneral did not devote enough resources to providing support to its end users, that the Service Desk did not have enough trained staff to handle the call volume, and that there was a significant increase in the number of end user calls that were not being answered. (Def.'s Stmt. ¶ 25.) In late 2007, Dan Burgess made restructuring of MaineGeneral's IT Division a top priority. In MaineGeneral's words: "managers began work on reorganizing IT to identify and acquire the skills needed to support the users of the new technologies." (Def.'s Stmt. ¶ 68.) These changes were no surprise to existing IT employees. They had been informed as early as 2005 that major changes would transpire, though Wyman maintains that Data Center CSTs also received assurances that they did not need to worry about their jobs. (Id. ¶ 69; Pl.'s Response ¶ 69.)[1]

---

[1]    Paragraphs 70-72 of MaineGeneral's statement concern a consultative report issued by Berry, Dunn, McNeill & Parker containing advice on how MaineGeneral should carry out its IT restructuring. These statements

Dan Burgess met with the IT Division workforce in May 2008 to notify them that a restructure was coming soon and, in late June 2008, MaineGeneral formally announced it was restructuring the IT Division. (Def.'s Stmt. ¶ 74.) In the spring of 2008, St. John and LaPlante met with the Data Center CSTs and told them there would be a reorganization of the IT Division, that jobs would be eliminated, and that some employees would have to apply for new positions. (Id. ¶ 75.) Wyman "admits and qualifies" this statement, offering that he understood at the time that the CST position would go, but not that his job would be in jeopardy. (Pl.'s Response ¶ 75.) MaineGeneral further states that its IT employees knew months in advance that jobs would be eliminated and that some people would have to compete for other positions. (Def.'s Stmt. ¶ 76.) This statement Wyman denies, offering a response to the effect that Dan Burgess told them they "would still be in IT where a lot of positions would be coming up," but not that he "would have to apply for another position." (Pl.'s Response ¶ 76.) Wyman's deposition testimony relates that Burgess "just said there would be positions available for applications." (Wyman Dep. at 73, Doc. No. 22.) Additionally, there is the following passage in Wyman's deposition testimony:

Q  You knew that your position was going to be eliminated --

A  The datacenter position was going to be eliminated, yes.

Q  And you knew prior to June 27, 2008, that to remain employed at MaineGeneral, you would have to apply for another position?

A  Correct.

Q  You had been told that before?

A  Right.

(Wyman Dep. at 117:16-22.)

---

and the associated denials are highly confusing, but they do indicate that the consultant recommended the elimination of the CST positions and an increase in the SDT positions. (St. John Aff. ¶ 15, Doc. No. 19.)

In the June 2008 IT restructuring, all eight CST positions[2] were eliminated and the supervisory position formerly held by Valerie Leathers was folded into the position held by Gale LaPlante. (Def.'s Stmt. ¶ 73.) On or about June 27, 2008, Wyman received a letter from Karen Gallup, HR Compliance Officer, formally announcing that his position as a Client Support Technician was being eliminated. (Id. ¶ 78.) Gallup's letter informed Wyman that he would remain employed in his current position for 45 days, during which time he could apply for other positions at MaineGeneral or he could end his employment and receive a severance package as of August 12, 2008. (Id. ¶ 79.) MaineGeneral states that Wyman qualified as a "just cause" employee, and that this status had a bearing on his rights (referencing, specifically, MaineGeneral's grievance policy, HR-19). (Def.'s Stmt. ¶ 104.)

Wyman applied for five positions, two of which were Service Desk Technician positions. (Id. ¶ 80.) Three Service Desk Technician positions were available: one for days, one for evenings, and one for nights. (Id. ¶ 82.) Wyman sought either the day or the evening job and believed he would receive one of them. (Id. ¶¶ 81, 83.) He interviewed with Gale LaPlante and HR Recruiter Donna Twist. (Id. ¶ 83.)

MaineGeneral offers that LaPlante and Twist asked each interviewee the same set of questions and then assigned an agreed-upon score to each interviewee based on his or her answers to the standard questions. (Id. ¶¶ 84-85.) MaineGeneral notes that, for internal candidates, LaPlante also had knowledge of each employee's work history from observation and performance evaluations, including Wyman's for 2005, 2006, and 2007. (Id. ¶ 86.) Interview score sheets for various candidates are attached to the affidavit of Gale LaPlante (Doc. No. 21). These scores were then compiled on a comparison sheet for the six internal candidates for the

---

[2] While MaineGeneral eliminated the CST positions, it retained and expanded the number of Desktop Support Technician positions. (Def.'s Stmt. ¶ 77.) The Service Desk Technician positions, also expanded, did not take on the Desktop Support Technician duties that Wyman previously had difficulty with.

Service Desk Tech positions. (Def.'s Stmt. ¶ 90.) LaPlante and Twist also assigned a separate, agreed upon "history" score in some cases, reportedly based on their knowledge of an internal candidate's work history, which they then averaged against the candidate's interview score. (Id. ¶ 88.) The exhibits associated with this process indicate that the history metric had a negative impact on Wyman, with five scores of 1 in areas related to initiative and interpersonal relations, with 5 being the best possible score. (Doc. No. 21-5.) Don Harvey was the only other internal candidate to receive history scores, and he received a few 2s, also in relation to questions related to initiative and interpersonal skills. (Doc. No. 21-8.)

Gale LaPlante decided whom she wanted to hire for the open Service Desk positions and made her recommendations to Mark St. John, which he approved. (Def.'s Stmt. ¶ 91.) If called to testify, LaPlante and St. John would testify that they never discussed or considered Wyman's age or health in connection with the hiring decision.[3] (Id. ¶ 100.) The SDT hires were as follows: Joe Parker for the day position; Don Harvey for the evening position; and Carol Wilson for the night position that Wyman did not apply for. MaineGeneral attests through Gale LaPlante that the selections were premised on the interview scores. (Id. ¶¶ 92-94.) When LaPlante made her recommendations to St. John that MaineGeneral hire Don Harvey and Joe Parker for the Service Desk positions for which Wyman also applied, St. John approved her recommendations because he agreed with her that Harvey and Parker were more qualified for the positions. (Id. ¶ 99.)

---

[3]     MaineGeneral does not contend that either LaPlante or St. John was unaware of Wyman's cancer or age. Wyman introduces a statement indicating that St. John once told Leathers that Wyman was "too sick" to take over for Leathers as a Data Center supervisor. (Pl.'s Response ¶ 100.) Wyman would offer this statement through his own testimony (he cites his own deposition) about what Leathers related to him. MaineGeneral raises a hearsay objection. (Def.'s Reply Mem. at 4-5.) Wyman has not sought to respond. I sustain the objection for summary judgment purposes. As for St. John's knowledge of Wyman's health problems and the difficulties they pose in relation to his work, those facts can be established through St. John's deposition testimony, which Wyman also cites. (St. John Dep. at 36, Doc. No. 28.)

Wyman also applied for a System Support Technician position and two other positions. MaineGeneral asserts that Wyman was not qualified for these positions. Wyman "admits and qualifies" the statements, saying that he could have performed them if given training. (Id. ¶¶ 96-97; Pl.'s Response ¶¶ 96-97.)

Wyman grieved the decision to deny him a position in the reorganization. A three-person grievance panel, with authority to overturn the decision, voted unanimously to uphold the decision. Their grievance review included an interview with Wyman and a separate meeting with Mark St. John. (Def.'s Stmt. ¶¶ 116, 118, 121.)

At the time of the decision, Wyman was 56 years old. Gale LaPlante was 53 and Mark St. John 46. Carol Wilson and Don Harvey were 51 and 48, respectively. Vuong Luu, an applicant who received a position as a Systems Support Tech, was 56. Joe Parker was 23 years old. (Id. ¶ 122; Pl.'s Response ¶ 122.) Ray Lord, age 55 at the time, was retained as one of two Desktop Support Analysts. (Id. ¶ 77.)

Raymond Lord has worked in IT for MaineGeneral at its Augusta Data Center since 2005. (Id. ¶¶ 28, 31.) Lord has signed an affidavit under penalty of perjury in which he attests that he did not regard Wyman as having the technological skills needed to perform the full range of hardware and software diagnostic tasks performed by technicians working in desktop support. (Id. ¶ 37.) However, he also indicates that the problems addressed by Desktop Support Technicians (hardware and software diagnosis and repair) are often more advanced than those addressed by Service Desk Technicians. (Id. ¶¶ 29, 34, 35.) For example, he explains that in 2007 and continuing to the present day, the Desktop Support Technician position has included the task of taking over tickets from the Service Desk that cannot be solved by the Service Desk Technicians. (Id. ¶ 34.)

Lord's familiarity with Wyman's skills relates to a period late in 2007 and into 2008 during which Lord gained assistance from Wyman and another individual, Mike Coro, who were on-loan to him from Ms. LaPlante, when they were not busy with Service Desk duties. Lord's affidavit explains that he worked adjacent to Wyman in the Data Center in Augusta, whereas Ms. LaPlante was primarily stationed at the Service Desk at First Park in Oakland. (Lord Aff. ¶¶ 2, Doc. No. 20.) Lord gained assistance from Wyman and Coro during the period when their responsibilities had decreased due to the transfer of some of their historical functions away from the Data Center. (Id. ¶ 6.) LaPlante and Lord maintain that, by November 2007, LaPlante expected Wyman and Coro would spend most of their time at Service Desk work because call volume started to increase. (Def.'s Stmt. ¶ 40.) According to Lord and LaPlante, there were times when LaPlante would call Lord to inquire what Wyman and Coro were doing because they were not taking Service Desk calls. Lord attests that he would get up to look and that Wyman and Coro were usually talking to each other and were not busy with tasks that would prevent them from taking Service Desk calls. (Id. ¶ 42; Lord Aff. ¶ 12.) Wyman denies this statement and cites the affidavit of Michael Coro, who attests that never to his knowledge did Ray Lord ever come into the office Coro and Wyman shared other than in relation to Desktop Support job shadowing. (Pl.'s Response ¶ 42; Coro Aff. ¶ 14.)

Service Desk has a telephone system that permits LaPlante to view data concerning Service Desk calls and that assigns calls to available personnel on the MaineGeneral phone system regardless of their physical location. (Def.'s Stmt. ¶ 43; LaPlante Aff. ¶ 15.) Wyman's response is to the effect that First Park was the front line for Service Desk calls and that he received calls on an overflow basis. (Pl.'s Response ¶ 43.) The telephone system in question,

CMS Supervisor, keeps track of, and allows LaPlante to view and print reports of data concerning Service Desk calls, including the following:

a. Number of calls per selected period of time;

b. Number of calls made but not answered (abandoned calls) per period of time;

c. Times employees log into and out of the call system;

d. Times employees who are logged in are available to take calls;

e. Number of calls answered by each employee assigned to the Service Desk per selected period of time;

f. Times employees are logged in but in "AUX" or "ACW" status, which means they have turned off their phone's ability to receive calls for some reason, such as to work on a problem or to take a break.

(Def.'s Stmt. ¶ 44.) MaineGeneral indicates that LaPlante set the system for Wyman, Coro, and Joe Parker (a June 2008 per diem hire at the Service Desk, age 23, who ultimately received one of the reorganized Service Desk positions) so that calls came to their phones only if none of the primary staff at the Service Desk was able to answer them. (Def.'s Stmt. ¶¶ 47, 48.)

LaPlante attests that Parker, Wyman, and Coro all received fewer calls than the primary Service Desk employees and that all three of them had the same opportunity to receive calls at the same rate. (Id. ¶ 49.) However, while Wyman was stationed at the Data Center with combined Data Center and Service Desk duties, Parker was stationed at First Park with exclusive Service Desk duties, working alongside the dedicated Service Desk Technicians. (Parker Dep. at 17, Doc. No. 29; LaPlante Dep. at 20.) Moreover, Parker's deposition testimony is to the effect that he was working alongside the Service Desk Techs within days of his hire, which is in tension with MaineGeneral's representation that his level of service desk work was as restricted

as Wyman's.  (Pl.'s Response ¶ 47.)  This sheds a different light on MaineGeneral's subsequent statements in praise of Parker for outperforming Wyman in regard to taking Service Desk calls.  (Def.'s Stmt. ¶ 50.)

MaineGeneral offers exhibits listing the number of calls handled by Joe Parker and by Wyman, the amount of time spent off-line, and the average call time, inviting a finding that Parker was the more able and dutiful employee.  (Id. ¶¶ 51-55;  LaPlante Aff. Exs. A & B.) MaineGeneral notes that the comparison data relate to a period in June and July 2008 when Wyman would have known that his Data Center job was being eliminated and that he would need to compete for a Service Desk job.  LaPlante attests in her affidavit that she expected that Wyman would have performed to the best of his ability in this period because he knew his job was being eliminated and he was competing with others for SDT positions.  (Def.'s Stmt. ¶ 56.) Wyman relates that he was undergoing BCG and Interferon treatments six times weekly in June 2008.  (Pl.'s Response ¶ 56.)  Additionally, the appearance from the exhibits is that Wyman's call volume was controlled whereas Parker's was not.  MaineGeneral has not provided a similar exhibit for the other SDTs located at First Park to dispel the inference that Parker was essentially functioning as a full-time, albeit per diem, SDT as of July 2008.  Wyman also qualifies these representations based on the fact that LaPlante never compiled this data comparison until after the decision was made to deny Wyman a SDT position and he was in the grievance process.  (Id. ¶ 50.)

LaPlante reports in her affidavit that Wyman told her sometime in 2008 that he was not comfortable taking Service Desk calls.  (Id. ¶ 60.)  Wyman denies it, but fails to cite deposition testimony or affidavit testimony in support of his denial.  Nevertheless, a citation offered by

Wyman in opposition to another statement turns up testimony to this effect.  (Pl.'s Response ¶ 88, citing Wyman Aff. ¶ 36.)

LaPlante maintains that there were a number of times every week when she would observe signs through the system that Wyman was logged out of the system or was in AUX status and not taking calls when he was expected to be doing so.  (Id. ¶ 57.)  Wyman's deposition testimony on this score is that LaPlante would call on occasion to ask why he was not logged in and, in some instances, he actually was logged in.  (Wyman Dep. at 106.)  He also explains that his Data Center work interfered with his Service Desk availability.  (Id. at 102-103.)  From LaPlante's perspective, however, Wyman and Coro were significantly slower to take calls, create a ticket by typing into the Service Desk database, resolve the call, or escalate the call to Desktop Support than the other employees who covered the Service Desk.  (Def.'s Stmt. ¶ 59.)  LaPlante also offers that Wyman, of all Service Desk candidates with prior experience in the job, was the only one who had not achieved a fully competent assessment rating in an annual evaluation (the last evaluation being August 2007—roughly ten months ahead of the reorganization).  (Id. ¶ 87.)

Defendant's Reply Statement includes a section that offers replies to Wyman's responses, mostly stating that Wyman's responses "should be stricken" on the ground that Wyman failed to cite supportive evidence.  The process of reviewing statements and responses necessarily entails a review of the evidence cited by both parties when qualifications and denials are offered.  My recitation has allowed some qualifications to certain of MaineGeneral's statements in light of responses made by Wyman, based on the evidence MaineGeneral cited in support of the statement in question and the evidence Wyman cited in support of his response.  I also note that Local Rule 56 does not contemplate this particular approach to reply statements offered by summary judgment movants.  The Rule states that the reply statement is to be limited to the non-

movant's separate statement of additional material facts.  D. Me. Loc. R. 56(d).  Although the Rule permits a party to request that statements be stricken, there is no suggestion in the Rule that a movant should ask that qualifications or denials be stricken on the basis of a contention that insufficient evidence has been cited.  The process of record review that is facilitated by the Rule already calls upon the Court to take the quality of the record citations into consideration when statements are contested.

Another concern arises from Wyman's Response Statement.  At paragraph 122, Wyman asserts that only he and Michael Coro did not remain after the reorganization and that, to the best of his knowledge, both suffered from cancer.  This assertion is significant, in my view, but Wyman's citations do not include a reference to any supportive testimony or exhibits.  Surprisingly, the assertion does not reappear in Wyman's Additional Statement.  However, it does exist in his affidavit (Wyman Aff. ¶ 22), and also in Mr. Coro's affidavit (Coro Aff. ¶ 19).  I would credit the statement, subject to a "qualification" that Wyman has not established that Michael Coro applied for a new position in IT and, thus, the materiality of Coro's cancer in not apparent.

**B.      Plaintiff's Additional Statement and Defendant's Reply**

Wyman's additional statements are not organized to follow a particular format and are not very conducive to a narrative.  The additional material statements that he offers relate the following:

Wyman holds associate's degrees in computer science and business management.  (Add'l Stmt. ¶ 1.)

Wyman emphasizes that he "met" his performance evaluations, including his 2007 evaluation from Valerie Leathers, and he emphasizes the positive comments she has offered in her affidavit concerning his work under her supervision.  (Id. ¶ 4.)

When MaineGeneral began its move to PC platforms in 1995, Wyman bought a PC for use at home, to better familiarize himself with the PC platform.  (Id. ¶¶ 5-7.)

Wyman states that he was appointed to be Leathers's backup when she was out of the office for leave in 2005.  (Id. ¶ 8.)  His record citation ("Laplante deposition, Exhibit 13, email 11/29/05") is not very helpful.  However, if the Court indulges Wyman and reviews the attachment he filed to the Leathers affidavit, support can be found (Doc. No. 38-8).

In March 2006, Leathers complimented the data center operators for good customer service and closing 1,241 tickets.  (Add'l Stmt. ¶ 9.)  Leathers was passing along a compliment she received from St. John, in which St. John told her and others:  "We have room for improvement—as I know you believe as well—but your efforts are being recognized already. Excellent job."  (Id.;  Doc. No. 35-3.)  St. John included Wyman and other CSTs in a team email in April 2006, commending them all for an excellent job in relation to a server downtime incident.  (Add'l Stmt. ¶ 10;  Doc. No. 35-4.)  St. John again directed praise to the IT group for customer service excellence in April 2007.  (Add'l Stmt. ¶ 12;  Doc. No. 38-3.)  St. John made a positive response to an April 2007 email from Wyman expressing Wyman's gratitude for a job shadowing opportunity in the EUC Department, though St. John's response was not worded as praise.  (Add'l Stmt. ¶ 13;  Doc. No. 36-2.)

In mid-June 2008, Wyman began to express concern to Gale LaPlante about his future at MaineGeneral.  He emailed LaPlante asking for Service Desk training at First Park.  This request was not granted.  (Add'l Stmt. ¶ 16;  Wyman Affidavit ¶ 21.)  According to Wyman's Additional

Statement, LaPlante sent herself an email stating that "We only have four desks so there is no room." (Add'l Stmt. ¶ 16.) Wyman cites the email, but I cannot find it despite my efforts. His affidavit recounts the matter, however. (Wyman Aff. ¶ 21.) Wyman says that there actually was room, because Parker—who was a relatively new per diem hire at this time—testified at his deposition that there was an available desk and terminal that was often not in use in the summer of 2008. (Id.) Somehow, Wyman gets his citation to the Parker Deposition wrong, but Parker's deposition testimony does support the statement and a favorable inference for Wyman, if one reads between the pages cited by Wyman's counsel. (See Parker Dep. at 20-21.) The Court should credit Wyman's statement that there was room to train additional people at First Park when Wyman requested training. (Add'l Stmt. ¶ 20.) Wyman's assertion, in effect, is that he was expressing his desire to prepare for a transition, but that management was inadequately considering what steps could be taken to facilitate his transition to a full-time position as a Service Desk Technician. While Wyman states that he was willing to be trained, he also emphasizes that he already knew the functions of the Service Desk Technician job. (Add'l Stmt. ¶ 19.)

Statements offered in paragraphs 18 and 19 of the Additional Statement are not incorporated because the cited exhibits (LaPlante Dep. Exs. 3, 4, 5) do not appear to be available on the docket. They are not attached to the transcripts of LaPlante's deposition so far as I can tell.[4]

Wyman cites a MaineGeneral human resources policy in support of a statement that it is a manager's responsibility to develop and improve staff competencies.[5] (Add'l Stmt. ¶¶ 23, 26,

---

[4]        Counsel filed LaPlante's deposition transcript at both electronic docket entry 39 and entry 40. None of the attached exhibits is identified as one of the cited exhibits.
[5]        MaineGeneral's "failure to authenticate objection" is overruled. MaineGeneral otherwise admits the statement.

51; MaineGeneral Human Resources Policy No. HR-17, Doc. No. 42-5.) Ms. Leathers, a former supervisor in IT, opines that Wyman should have had an opportunity to transition to the Service Desk and should have been given a performance improvement plan if he proved unable to successfully perform all of those duties. (Add'l Stmt. ¶ 24; Leathers Aff. ¶ 25, Doc. No. 34.) A finder of fact might associate HR-17 and Wyman's "just cause" status and conclude that Ms. Leathers's opinion is particularly salient.

Michael Coro, another Data Center employee who worked alongside Wyman, echoes Wyman's assertion that they were led to believe they would transition to Service Desk Technician positions if other IT jobs did not materialize for them. (Add'l Stmt. ¶ 25; Coro Aff. ¶ 17.)

Wyman observes that the Berry Dunn McNeil & Parker report (filed by MaineGeneral in support of its motion, Doc. No. 19-1) anticipated that there should be cross-training of support personnel, recommended "broad training" for department members, and flagged insufficient training as an existing weakness. (Add'l Stmt. ¶ 30; St. John Aff. Ex. A at ii, 3, 6, 9, Doc. No. 19-1.)

St. John has testified that the functions of the day shift Service Desk Technician position remained the same between 2005 and 2008, with the exception of call volume. (Add'l Stmt. ¶ 31.)

St. John told Wyman in 2008 that St. John felt Wyman could not keep up with the pace or with the new applications programs. (Id. ¶ 32.)

Wyman did receive some job shadowing training in the area of desktop support with Ray Lord while Wyman was supervised by Valerie Leathers. (Id. ¶¶ 33-34.) In this capacity,

Wyman replaced memory chips, re-imaged PCs, installed software onto PCs and performed similar work on PCs.  (Id. ¶ 35.)

MaineGeneral admits Wyman's statements to the effect that LaPlante had the ability to set the access level for each person taking Service Desk calls and to monitor the CMS Supervisor data in real time and that LaPlante never considered that Wyman was ill from cancer treatments during the period associated with the Wyman-Parker performance comparison.  (Id. ¶¶ 37-38.)

Parker lacked significant computer hardware or software education or training when he accepted the Service Desk per diem work, with the exception of one course called Business Applications of Technology, which involved in-depth utilization of Microsoft's Excel and Access programs.  Parker also lacked experience troubleshooting with computer end users or performing functions like what was required of Service Desk Technicians.  (Id. ¶¶ 41-45;  Def.'s Reply Stmt. ¶¶ 41, 42, 43.)

Wyman requests that the Court draw certain inferences about what Policies HR-02 and HR-03 have to say about his need for transfer as an internal employee outweighing any interest or right of Parker to enter into a Service Desk Technician position.  (Add'l Stmt. ¶¶ 48-50.) Policy HR-03 can be found among Wyman's filings (Doc. No. 39-2), but I cannot find Policy HR-02 on the docket.  Policy HR-03 indicates that length of service may be used as a factor when existing, non-probationary employees (like Wyman) seek internal transfers.[6]

Wyman returns to Policy HR-17, highlighting language in it that calls for implementation of a performance improvement plan when an employee falls short in relation to "critical competencies and performance indicators."  (Add'l Stmt. ¶ 52; MaineGeneral Human Resources

---

[6]     Wyman cites HR-02 in relation to the use of seniority in hiring or retention decisions.  (Add'l Stmt. ¶ 48.) He cites HR-03 in support of propositions to the effect that Parker did not deserve any consideration as a per diem employee.  (Id. ¶¶ 49-50.)  I consider the material point to be that MaineGeneral has employment policies that recognize seniority as a relevant employment factor and this is supported by Wyman's citation to Policy HR-03.  I recognize that this does not neatly correspond with Wyman's presentation.

Policy No. HR-17 at 4, Doc. No. 42-5.) He flags the fact that he never was identified as needing to undergo such a plan in his 20 years of service. Finally, Wyman offers a statement related to Policy HR-29. However, it appears that Wyman has failed to attach this document to any of his filings.[7]

## DISCUSSION

John Wyman complains of MaineGeneral's elimination of his position and hiring of a younger, healthy employee in his stead. He alleges discrimination based on age and disability. He does not allege that he requested accommodation for his disability or that he required any particular accommodation or that MaineGeneral refused to provide any particular accommodation. (Compl. ¶¶ 11-12, Doc. No. 3-4.) MaineGeneral argues that Wyman cannot raise a genuine issue of material fact for trial on his discriminatory discharge or discriminatory hiring theories and that Wyman has not even put forward a failure to accommodate claim. MaineGeneral is correct that Wyman fails to develop any failure to accommodate claim. However, Wyman's presentation is sufficient to generate a genuine issue in connection with his claims of discriminatory bias in employment decisions.

---

[7]     Wyman has filed a 21-page, 63-paragraph affidavit that significantly exceeds his additional statement in length. Additionally, Wyman's memorandum in opposition includes many citations to the record that have not been reproduced in a statement of material fact. It is a mistake for Wyman to assume that the Court will review, let alone review and accept, every factual assertion made in Wyman's affidavit when Wyman's counsel has not introduced those assertions through a Local Rule 56 statement. The same applies to Wyman's citations to other record materials in his memorandum. With limited exceptions, parties are required to introduce factual assertions through a statement of fact in order to allow the other party an opportunity to qualify or deny the statement in question.

I also note that Wyman more than once cites his affidavit but identifies a paragraph, such as paragraph 76, which does not exist. (See, e.g., Add'l Stmt. ¶ 32.) In such instances, I have refrained from searching through his lengthy affidavit to determine whether some assertion can be found therein to support the statement, qualification, or denial he offers.

It is not the Court's duty to ferret through the record to salvage a party's summary judgment presentation. Nevertheless, there are times when evidence will come to the Court's attention in the course of its review of the record and the Court is not required to turn a blind eye to it. Ricci v. Applebee's Northeast, Inc., 297 F. Supp. 2d 311, 321 (D. Me. 2003). In this regard, it will be apparent to the Court that certain technical violations have been overlooked in this Recommended Decision.

**A.    Failure to Accommodate**

MaineGeneral asserts in its motion that Wyman's disability claim "is a straightforward discrimination claim, not a failure [to] accommodate claim."  (Def.'s Mot. at 12, Doc. No. 16, citing Compl. ¶ 11.)  Wyman's response to this is perfunctory.  Wyman says:

> Plaintiff differs with Defendant's view that this is not, in part, an accommodation claim, for a couple of reasons.  In the end, Wyman could have been hired on the Day Shift and his younger counterpart willingly put on the night shift.  Also John Wyman ought to have been counseled on and considered, in context, for medical retirement.  It is rather cold hearted disregard that this option was evidently never considered.

(Pl.'s Mem. in Opp'n at 2, Doc. No. 26.)  Just prior to the conclusion of his memorandum, Wyman says he should have been considered, at the very least, for "disability retirement" (id. at 27) and that "reasonable accommodation would cost money that a medical or other retirement would cost, and regardless of money per se, that St. John did not want to deal with the effects of Wyman's age and disability" (id. at 28).

My review of the pleadings and the summary judgment record failed to uncover any development by Wyman of a failure to accommodate claim.  By all appearances, this theory has never been asserted or developed in this litigation.  Although MaineGeneral denies the existence of such a claim in its motion, Wyman fails to develop a legal argument with any citation to authorities that would tend to establish the viability of a failure to accommodate theory.  Wyman's factual presentation also falls short of this objective.  The Court should enter summary judgment in MaineGeneral's favor with respect to any theory of failure to accommodate.

**B.    Discriminatory Bias**

The Americans with Disabilities Act prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Similarly, the Age

Discrimination in Employment Act makes it unlawful for any employer to "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The Maine Human Rights Act affords omnibus protection against employment discrimination based on age or disability, among other classifications. 5 M.R.S. § 4572(1)(A).

It is plain that Wyman lacks direct evidence of discriminatory animus on the part of decision makers at MaineGeneral. Consequently, Wyman's claims are best evaluated by means of the burden-shifting paradigm prescribed by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973). Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 123-24 (1st Cir. 2011) (ADEA); Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 99-100 (1st Cir. 2007) (ADA); Doyle v. Dep't of Human Servs., 824 A.2d 48, 54, 2003 ME 61, ¶ 14 (MHRA). Initially, the burden falls upon the plaintiff to make a *prima facie* showing, which entails a relatively light challenge. If the *prima facie* showing is made, a burden of production falls to the defendant to introduce a legitimate, non-discriminatory justification for the termination or failure to hire the plaintiff, which justification must be demonstrated through admissible evidence. Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010). The burden then returns to the plaintiff, who must show that there is evidence of record that could permit the finder of fact to conclude, based on a preponderance of the evidence, that the defendant's justification is a pretext offered to hide discriminatory bias. Id.; Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143, 146-48 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Quinones v. Houser Buick, 436 F.3d 284, 289-90 (1st Cir. 2006).

MaineGeneral concedes that Wyman is able to make a *prima facie* showing and willingly "accepts the burden to articulate a legitimate, nondiscriminatory reason for its decision not to

rehire him." (Def.'s Mot. Summ. J. at 5, Doc. No. 16.)  MaineGeneral offers as its legitimate, nondiscriminatory justification the "IT restructuring" and the determination "that Don Harvey and Joe Parker were better qualified for the positions at issue." (Id.)

MaineGeneral's motion first addresses the age discrimination claim.  In that section of its motion, MaineGeneral develops an overarching narrative depicting an employer "in the throes of a transition from mainframe computing to Windows-based computing" that simply surpassed an employee's (Wyman's) skills and aptitudes. (Id. at 6.)  MaineGeneral highlights evidence from which a finder of fact could conclude that Wyman did not exactly put forward his best efforts despite knowing that there was no guaranteed place for him in a restructured IT department. (Id. at 7-8.)  MaineGeneral also puts to good effect evidence from which a finder of fact could conclude that the decision to let Wyman go was based purely on objective, nondiscriminatory evaluations and measures. (Id. at 9.)  Specific to the age-discrimination claim, MaineGeneral observes that other workers of comparable age to Wyman were retained, including Lord, Luu, and Wilson. (Id.)

Upon turning to the claims of disability discrimination, MaineGeneral asserts that "[t]he facts relating to this claim are essentially the same as for the age claim," but flags the fact that MaineGeneral has a track record of having accommodated Wyman's medical needs over the years. (Id. at 12.)  MaineGeneral also asserts that its use of a three-person grievance panel, and the panel's decision to uphold the employment decision, offers some insulation against Wyman-favorable inferences. (Id. at 10.)  MaineGeneral also invokes, in passing, the "business judgment rule," citing Boyajian v. Starbucks Corporation, 587 F. Supp. 2d 295, 305 (D. Me. 2008). (Id. at 11.)

Wyman focuses his responsive memorandum on the question of whether an inference of discriminatory motive arises from the summary judgment record. Counsel's prose is strident, and many of the assertions cannot neatly be aligned with the summary judgment record. There is little to be gained from rehashing Wyman's language and arguments at length here. However, Wyman appropriately addresses his memorandum to the inferences of discriminatory treatment that are available to him.

There has been very little discussion offered by the parties concerning the legal impact, if any, of MaineGeneral's provision of a grievance process for "just cause" employees like Wyman. MaineGeneral presents the process as an additional basis for the finder of fact to conclude that MaineGeneral's decision was not motivated by discriminatory animus. In my view, the grievance panel is a relevant factor for the finder of fact to weigh, but is not particularly significant, in a legal sense, for purposes of summary judgment. By the time Wyman went before the grievance panel, he had already received a notice of termination and was informed that his supervisors did not intend to select him for a Service Desk Technician position. The notice of termination and the refusal to select, both of which were imposed ahead of the grievance process, qualify as adverse employment actions, because they "materially change[d] the conditions" of Wyman's employment. Valentin-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006). The fact that a "neutral" grievance panel later approved of the outcome would not serve to erase the fact that one or more supervisors subjected the employee to adverse employment actions.

MaineGeneral contends that this case is similar to two others in which district courts have granted summary judgment to the defendant employers. (Def.'s Mot. at 10-11, citing Bowen-Hayes v. Troxler Elec. Labs., Inc., No. 1:05-CV-379, 2007 WL 1101226, 2007 U.S. Dist. Lexis

26704 (M.D.N.C. Apr. 11, 2007), and Torres-Sylvan v. Am. Civil Liberties Union, No. 01 Civ. 0343 (DAB), 2005 WL 1719788, 2005 U.S. Dist. Lexis 14868 (S.D.N.Y. July 22, 2005).)  The cases bear some similarity.  There are material differences as well.  In Bowen-Hayes, the employer reduced its total workforce to between 70 and 80 employees from about 150 and hired a new employee with critical skills the plaintiff lacked to manage its new PC network.  The plaintiff did not even apply for the management job that the new person obtained.  Thereafter, the employer had a three-person information-systems department.  The employer ultimately concluded that there was no need for the plaintiff's position and that it could get by with two employees in this area.  2007 WL 1101226, *1-2, 2007 U.S. Dist. Lexis 26704, *3-6.  Here, MaineGeneral did not go through such a drastic reduction in force and maintained multiple SDT positions after the reorganization.  Wyman has raised a genuine issue whether he had comparable or better skills than the person who functionally replaced him.  In Torres-Sylvan, the plaintiff's position was eliminated by technological changes, as was Wyman's, but the plaintiff did not spend a period of time performing the PC-related duties that were delegated to a new, post-reorganization position, unlike Wyman.  Nor did the plaintiff in Torres-Sylvan apply for the position that became available after the information-systems reorganization.  The Court was also unable to identify evidence of disparate treatment based on a protected category and made its determination based on a failure to satisfy the *prima facie* showing.  2005 WL 1719788, *2, 3, 13, 2005 U.S. Dist. Lexis 14868, *6-7, 11, 43.  MaineGeneral has conceded that there is a *prima facie* showing in this case.

Ultimately, my view is that the summary judgment record is minimally sufficient to permit a finder of fact to infer, by a preponderance of the evidence, that Wyman's age and disability were determinative factors that explain why Wyman did not remain in the wake of the

IT restructuring.   I base this conclusion both on the facts relating to Wyman's uncontested *prima facie* showing and on his evidence of pretext.  In particular, the evidence associated with MaineGeneral's management of Wyman subsequent to Ms. Leathers's departure from IT is inconsistent with the kind of treatment that might ordinarily be expected for a previously valued employee with twenty years of experience.  Without question, the pace of technological change accelerated markedly in the new millennium, but there is an inference here that Wyman's managers failed to give him fair regard based on a view that he held an outdated skill set, even as MaineGeneral's human resources policies set a groundwork for better treatment—in particular, attention to training and development.  This is reinforced by the ready preference for a much younger per diem worker who, while bright and capable, had no appreciable experience in IT and no institutional history.  MaineGeneral would rejoin that Wyman's history was considered, and that it was a net negative, but Wyman is correct that his historical evaluations are inconsistent with this quick assessment, as is the absence of any focused critique in his evaluations indicating that he lacked the skills necessary to perform the Service Desk functions.

Additionally, Wyman is correct, in my view, that a finder of fact could regard the direct comparison of Wyman and Parker's call volumes and call times as an unfair, post-hoc justification.  The record does not foreclose an inference that Wyman's mixed duties in the Data Center placed him in more of a back-up position, as far as Service Desk calls were concerned, whereas Parker received focused training and attention at the First Park location, including steady responsibility for handling Service Desk calls alongside his trainers.  In addition, Parker's testimony invites a finding that LaPlante could have trained Wyman at an available terminal at First Park and the record suggests this would have been the preferred way to go about preparing a twenty-year employee for transition within the Department, if he really was deemed deficient

in some way to handle Service Desk calls efficiently and steadily. Also germane to this potential view of the evidence are the facts that Wyman already had a background in the Service Desk function and that additional training in this regard likely would not have been onerous for MaineGeneral. Ms. Leather's affidavit reinforces this view and suggests that it should have been the presumptive course of action given MaineGeneral's policies.

Of course, Wyman's presentation of himself as someone who qualified as both an older worker and a disabled worker invites an attempt to pigeonhole his claim in one or the other category. A fairer approach, in my view, is to resist the distinction. Wyman was an older worker with cancer. The fact that Wyman was the only in-house applicant for a Service Desk Technician job who both had cancer and failed to secure a position is probative of unlawful bias as is his functional replacement by a considerably younger worker. These facts are essential to Wyman's uncontested *prima facie* showing and that *prima facie* showing remains relevant for purposes of the ultimate burden Wyman bears under the McDonnell Douglas burden-shifting paradigm. Together, Wyman's *prima facie* showing and his pretext showing shed enough light to *permit*—though by no means require—a finding that he was adversely impacted by age and disability considerations.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant's Motion for Summary Judgment (Doc. No. 16), IN PART, and enter judgment to the effect that Wyman has neither presented nor developed a failure to accommodate claim.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

February 17, 2012                    /s/ Margaret J. Kravchuk
                                     U.S. Magistrate Judge